Leslie Bryan Hart, Esq.
State Bar No. 4932
Courtney Miller O'Mara, Esq.
State Bar No. 10683
FENNEMORE CRAIG, P.C.
300 East Second Street, Suite 1510
Reno, Nevada 89501
Telephone:    (775) 788-2200
Facsimile:    (775) 786-1177
lhart@fclaw.com; comara@fclaw.com

Nicholas M. Menasché, Esq. (will comply with LR IA 10-2 within 7 days.)
State Bar of New York 4495214
ROBINSON BROG LEINWAND GREENE
 GENOVESE & GLUCK P.C.
875 Third Avenue, 9th Floor
New York, New York 10022
Telephone: (212) 603.6300
Facsimile: (212) 956-2164
nmm@robinsonbrog.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| SOUTHPORT LANE EQUITY II, LLC, individually and derivatively on behalf of MASSIVE INTERACTIVE, INC., a Nevada corporation,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>RON DOWNEY, DEREK ELLIS, MAX RAMSAY, MONIQUE ELLIS, DOMINIC DE LORENZO, ALEX DROSIN, and ANTAINE FURLONG,<br><br>　　　　　Defendants.<br><br>and<br><br>MASSIVE INTERACTIVE, INC., a Nevada corporation;<br><br>　　　　　Nominal Defendant | CASE NO.: 3:15-cv-0335<br><br><br><br><u>**COMPLAINT**</u> |

/ / /

Plaintiff Southport Lane Equity II, LLC ("Plaintiff" or "Southport Lane Equity"), individually and derivatively on behalf of Massive Interactive, Inc. ("Massive" or the "Company"), for its complaint against the officers and directors of Massive, Ron Downey ("Downey"), Derek Ellis ("D. Ellis"), Max Ramsay ("Ramsay"), Monique Ellis ("M. Ellis"), Dominic De Lorenzo ("De Lorenzo"), Alex Drosin ("Drosin"), and Antaine Furlong ("Furlong", together with Downey, D. Ellis, Ramsay, M. Ellis, De Lorenzo, and Drosin, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1. This is an action, brought directly and derivatively by Southport Lane Equity, the largest common stock holder of Massive, a publicly-traded corporation, organized and existing under the laws of the State of Nevada (though currently in default, according to the Secretary of State's website), against the officers and directors of Massive for their attempts to loot the Company's treasury and for the wrongful purported dilution of Southport Lane Equity's equity in the Company, all in breach of their fiduciary duty to the Company and its shareholders.

2. By virtue of self-dealing through sham transactions, Defendants have repeatedly issued themselves equity, or the right to equity, in the Company, purporting to dilute Southport Lane Equity's ownership in the Company from approximately ninety percent (90%) to just under fifty percent (50%), while taking on significant debt for worthless transactions with insiders, all in a matter of weeks.

3. Defendants have engaged in this conduct while refusing to hold any of the required or requested meetings of Massive's shareholders or the Board of Directors. Indeed, to prevent Southport Lane Equity from objecting to this conduct, Defendants have unilaterally announced, without any authority or basis and without holding a meeting of the Board of Directors, that Andrew Scherr ("Scherr"), Southport Lane Equity's sole designee to the Board of Directors, is no longer recognized as a Board member.

4. By reason of the foregoing, Plaintiff is left with no choice but to seek (a) declaratory relief that: (1) Scherr is a proper member of the Board and has been since December 2013; (2) the Wunderkind Transaction is void; (3) the Private Offering is void; and (4) shares acquired by

Furlong, Ramsay, Drosin, or M. Ellis or other purported officers or directors pursuant to the Stock Incentive Plan are void; (b) seek a receivership of the Company, pursuant to Nevada law, on the ground that the Company appears to be insolvent or approaching insolvency and the business of the corporation is threatened with irreparable injury because the directors are so divided; and (c) damages in an amount to be determined at trial, but exceeding $75,000.

**PARTIES**

5. Southport Lane Equity is a Delaware limited liability company, with offices at 17 State Street, 16th Floor, New York, New York 10004. Since November 2013, Southport has continuously held common shares and preferred shares in Massive and continues to be a shareholder at the time of the filing of this action.

6. Southport Lane Equity is a wholly-owned subsidiary of Southport Lane, L.P. ("SL").

7. Downey resides in the United Kingdom, and is Chief Executive Officer and Chairman of Massive's Board of Directors.

8. Furlong resides in the United Kingdom, and is Chief Financial Officer and a Director of Massive.

9. D. Ellis resides in the United Kingdom and is Chief Creative Officer and a purported Director of Massive.

10. Ramsay resides in the United Kingdom, and is Chief Technical Officer and a purported Director of Massive.

11. M. Ellis resides in the United Kingdom, and is Senior Vice President, People & Operations, of Massive.

12. De Lorenzo resides in the United Kingdom, and is Director, Product Strategy, of Massive.

13. Upon information and belief, Drosin resides in the United States in New York City, and is President, North America, of Massive.

14. Nominal Defendant Massive is a Nevada corporation with its executive offices and place of business in London and additional offices in New York, Sydney and Prague.

**JURISDICTION AND VENUE**

15. This is an action for breach of fiduciary duty under the statutes and the common law of the State of Nevada. This Court has original jurisdiction of this action, pursuant to 28 U.S.C. § 1332(a)(3) (diversity of citizenship), because the amount in controversy exceeds the sum or value of $75,000 and is between citizens of different States and in which citizens or subjects of a foreign state are additional parties.

16. Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because Massive is a Nevada corporation and the activities complained of herein have an effect in this State.

17. Personal jurisdiction may be asserted over each of the Defendants, who are officers and/or directors, of Massive, a Nevada corporation, pursuant to Nev. Rev. Stat. § 14.065(1) and Nev. Rev. Stat. § 78.135(1). Defendants have sufficient minimum contacts with Nevada so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

**GENERAL ALLEGATIONS**

**I.  Southport Lane Equity Acquires a Majority Ownership Interest in Massive and Installs the Board of Directors**

18. In early 2013, SL, a New York-based private equity firm and the parent company of Southport Lane Equity, was approached by the management of Massive Media Pty Limited ("Massive Media"), a Sydney- and London-based middleware technology firm, regarding a buy-out from its existing Australia-based ownership, comprised of STW Communications Group Ltd., Downey, D. Ellis, and Anna-Louise van Rooyen.

19. SL was, at the time, a fund focused primarily on the acquisition and control of distressed on and offshore insurance companies.

20. SL also made private-equity style investments that would often become, at least in part, functionally part of the investment portfolios of SL-affiliated insurance companies.

21. As part of this buyout proposal, Xtreme Oil & Gas, Inc. ("Xtreme"), a publicly-traded Nevada corporation, would complete its exit from the oil and gas industry (through various asset sales) and enter into the media business through the acquisition of Massive Media, with SL

funding the transaction and becoming the majority stockholder of the new company.

22. Accordingly, on or about November 7, 2013, pursuant to a Stock Purchase Agreement between Xtreme and Southport Lane Equity, Southport Lane Equity purchased 55,000,000 shares of common stock of Xtreme, which gave Southport Lane Equity ownership of approximately 90% of the common stock of Xtreme.

23. Thereafter, on or about November 15, 2013, pursuant to a Stock Purchase Agreement dated October 17, 2013, Xtreme purchased all the outstanding equity of Massive Media Pty. Limited for approximately $4,167,190 (the "Massive Stock Purchase").

24. Contemporaneously with the Massive Stock Purchase, Southport Lane Equity organized a reverse merger of Massive Media Pty. Limited into Xtreme (the "Reverse Merger").

25. On or about November 25, 2013, after the reverse-merger, at the direction of Southport Lane Equity, Xtreme changed its name to Massive.

26. At the completion of this series of transactions, Southport Lane Equity owned approximately 90% of the outstanding common and preferred shares of Massive.

27. Thereafter, in or around December 2013, subject to the approval of an amendment of the Bylaws, Downey, Furlong, Jeffrey Devers ("Devers"), Richard Bailey ("Bailey"), and Scherr were appointed to the Board of Directors of Massive, contingent upon a board resolution amending the Company's Bylaws.

28. On or about December 27, 2013, Massive, through an 8-K filed with the Securities and Exchange Commission, announced the contingent appointment of the directors of the Company.

29. Massive's 10-K for fiscal year ended December 13, 2013, filed on April 15, 2014, later recognized Downey, Furlong, Devers, Bailey, and Scherr as the directors of the Company.

30. On or about July 29, 2014, by written consent in lieu of a meeting, a majority of shareholders of Massive approved and adopted a board resolution amending the Bylaws of the Company to increase the number of directors from two to five, which made effective the appointment of Downey, Furlong, Devers, Bailey, and Scherr as members of the Board of Directors of Massive, effective as of December 27, 2013. During August of 2014, Bailey resigned

his position as a director of Massive. Southport Lane Equity lacks information about who, if anyone, purportedly replaced Bailey.

**II.     Defendants Breach Their Fiduciary Duties**

31.     By reason of their positions as officer, directors, and/or fiduciaries of Massive and because of their ability to control the business and corporate affairs of Massive, Defendants owed and owe Massive and its shareholders, including Southport Lane Equity, a fiduciary obligation "to exercise their power in good faith and with a view to the interest of the corporation." NRS 78.138. Defendants were and are required to act in furtherance of the best interests of Massive and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

32.     Shortly after the Massive Stock Purchase and the Reverse Merger, Defendants began to engage in a series of transactions that were designed to loot the corporate treasury, to the detriment of the Company and in breach of their fiduciary duties as directors and/or officers of the Company, while diluting the shares of the Company's principal investor and shareholder, Southport Lane Equity.

33.     By committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

34.     The Defendant Directors/Officers, who did not personally benefit from or participate in the transactions described herein, ratified and/or acquiesced in the breaches of the others.

**A.     The Wunderkind Transaction**

35.     On or about May 1, 2014, Defendants caused Massive to purchase all outstanding shares of Wunderkind Group Pty Ltd. ("Wunderkind"), an Australian company, pursuant to a Stock Purchase Agreement, in exchange for a convertible promissory note issued by the Company (the "Wunderkind Note"), for the principal amount of $5.5 million, bearing interest at the rate of

0.5% annually (the "Wunderkind Transaction").

36. Although Massive's 10-K annual report for the fiscal year ended December 31, 2014, filed on April 3, 2015, (the "2014 10-K") stated Massive purchased Wunderkind "to enable [Massive] to acquire additional technology to support our current product offerings," Wunderkind, according to its website (http://www.wunderkind.com.au), is a company of "Recruitment Specialists in Digital, Creative, Sales & Marketing Talent."

37. Prior to the Wunderkind Transaction, Wunderkind was owned and controlled by directors and officers of Massive, including Downey, M. Ellis, and De Lorenzo. Indeed, Downey was the majority shareholder of Wunderkind. Additionally, the De Ellis Family Trust was an owner of Wunderkind. The obligees under the Wunderkind Note are Downey, M. Ellis, De Lorenzo and the De Ellis Family Trust.

38. Southport Lane Equity does not believe either the Wunderkind Transaction or the Wunderkind Amendment were fair to Massive at the time each was purportedly authorized.

39. The officers and directors interested in the Wunderkind transaction failed to comply with NRS 78.140 and therefore the transaction is voidable.

40. The Wunderkind Note was due and payable on May 1, 2015, unless a conversion event under the Wunderkind Note occurred, which would have the effect of converting the Wunderkind Note to up to 45% of the total shares of the Company's outstanding common stock.

41. Although an 8-K filed by Massive on April 1, 2014, disclosed a letter of intent, containing the basic terms of the Wunderkind Transaction and signed by Scherr as Southport Lane Equity's representative (rather than as a Board member), the letter stated that, before the transaction could be consummated, it required the approval and written consent of the Board of Directors of Massive.

42. Nevertheless, the Wunderkind Transaction was consummated without convening a meeting of the Board of Directors to review and/or vote on whether to consummate the Wunderkind Transaction. Had a meeting been called, Downey should have recused himself as interested in the transaction, leaving only Devers, Bailey, Furlong, and Scherr to vote on the proposed transaction.

43. Upon information and belief, Defendants, insiders playing both sides of the transaction, caused Massive to agree to an inflated purchase price for Wunderkind, a company that had no real value to Massive, because Defendants were the beneficiaries of that transaction.

44. Moreover, the Wunderkind Transaction was predicated upon a grossly inflated valuation of Wunderkind by Downey; which inflated value was not disclosed to Southport Lane Equity until SEC filings subsequent to the transaction were made available to the public.

45. In the 2014 10-K, filed on April 3, 2015, Defendants caused Massive to state that, as of December 31, 2014 (only seven months after consummating the Wunderkind Transaction), it was unable "to pay the Wunderkind Note if the Wunderkind Note is not converted to shares of our Common Stock when due on May 1, 2015."

46. According to the Company's 10-Q for the quarterly period ended March 31, 2015 (the "March 2015 10-Q"), by March 31, 2015, Massive had not repaid any of the Wunderkind Note.

47. On April 24, 2015, Defendants caused Massive to purportedly amend the Wunderkind Note (the "Wunderkind Amendment") to provide that until the Wunderkind Note is paid in full, the noteholders (Defendants Downey, M. Ellis, and De Lorenzo) would have the right to convert all or part of the outstanding principle of the note, at any time, into a number of shares of the Company's common stock equal to 45% of the total shares of common stock issued and outstanding, effectively creating a mechanism to dilute Southport Lane Equity's interest in the Company to less than 50%.

48. It is unknown to Southport Lane Equity whether the Wunderkind Noteholders have converted the principle owed to share of Massive, which would dilute Southport Lane Equity.

49. Further, the Wunderkind Amendment was consummated without convening a meeting of the Board of Directors (or the shareholders) to review and/or vote on whether to enter into the Wunderkind Amendment, much less a meeting of disinterested Directors. At the time the Board of Directors was made up of Scherr, Furlong, Devers, Bailey, and Downey, with Downey being a party interested in the transaction on which the Board of Directors should have voted.

50. Upon information and belief, Defendants never intended to cause Massive to repay or satisfy the Wunderkind Note with cash and the Wunderkind Transaction was a sham transaction designed to allow Defendants to acquire approximately 45% of the total shares of the Company's common stock while diluting Southport Lane Equity's approximate 90% share in the Company to a percentage below the 50% mark.

51. Because a majority of the Massive shareholders owning stock prior to any Wunderkind conversion did not authorize such acquisition of controlling interest pursuant to NRS 78.379, shares of Massive purportedly owned by Downey and D. Ellis as a result of the Wunderkind Amendment are voidable.

**B. The October 2014 Financing**

52. According to the October 31, 2014 8-K, the Company apparently entered into certain transactions involving Gil Orbach ("Orbach").

53. On or about October 24, 2014, Defendants caused the Company to enter into a Note and Warrant Purchase Agreement with Orbach to issue a $1,000,000 in principal amount promissory note (the "Orbach Note") and warrants (the "Orbach Warrants") to purchase an aggregate of 100,000 shares of the common stock, $0.001 par value, of the Company (the "Orbach Offering"). The Orbach Note and Orbach Warrants were issued by the Company to Orbach on or about October 24, 2014.

54. The Orbach Note, which has a maturity date of October 24, 2015, bears interest at a rate of 10.0% per annum, payable quarterly. The Orbach Note purports to be senior to obligations owed to any other creditors, including instruments, or contractual obligations of the Company, and states on its face that it cannot be subordinated without the written approval of Orbach. In the event that a party other than Orbach or his affiliate (which specifically includes any entity controlled by Zachary Venegas or Scott Ogur) acquired 20% or more of the equity or assets of the Company (a "Change in Control"), the Orbach Note purports to give the right to demand that the principal and interest for one year shall become immediately due and payable.

55. The Orbach Warrants expire three years after their initial issuance date and may be exercised for a purchase price equal to $0.25 per share of common stock, subject to customary

anti-dilution adjustments. In the event of a Change in Control, the exercise price of the Warrant shall reset to $0.05 per share and the number of shares of Common Stock underlying the Warrant shall increase to 550,000.

56.   According to the Company's Form 8-K dated October 31, 2014, signed by Furlong, the proceeds of the Offering were intended for general corporate purposes.  The 8-K stated, however, that the description of the transaction was not complete and was qualified by reference to the agreements, which the Company did not file at that time.

57.   Defendants caused the Orbach Offering to be consummated without convening a meeting of the Board of Directors (or the shareholders) to review and/or vote on whether to consummate this transaction.

58.   Issuance of stock requires Board approval.  Thus, warrants must be approved by the Board as well.  Defendants purported issuance of the Orbach Note and Orbach Warrants without following proper channels constitutes mismanagement of Massive.

59.   The Orbach Note and Orbach Warrants were not authorized by the Board.

**C.   The Private Offerings to D. Ellis and Downey**

60.   On or about March 23, 2015, Massive closed on private offerings of secured convertible promissory notes (the "March 2015 Notes") in the aggregate amount of $636,310 to multiple investors (the "March 2015 Noteholders").

61.   The March 2015 Notes are secured by a first priority lien on all the Company's assets pursuant to a security agreement among the Company and the March 2015 Noteholders.

62.   The March 2015 Notes bear interest at an annual rate of 12% (a significantly high interest rate) and mature on the first to occur of (i) December 31, 2015, (ii) certain change in control transactions (each a "Deemed Liquidation Event"), or (iii) the closing of the next issuance and sale of capital stock of the Company resulting in gross proceeds to the Company of at least $2,000,000 (a "Qualified Financing").

63.   The March 2015 Notes provided that, in the event of a Deemed Liquidation Event, the Company will pay each noteholder an additional purchase premium equal to 100% of the principal amount of such holder's March 2015 Note.  In the event that any note remained

1 outstanding an unpaid after December 31, 2015, the Company agreed to pay the noteholder
2 monthly liquidated damage payments equal to 1% of the original principal amount of the March
3 2015 Note, for each month it remained satisfied, up to 12%.  And upon the closing of a Qualified
4 Financing, the noteholders would have the option to convert the principal and accrued interest on
5 their notes into shares of securities sold during the Qualified Financing, with a 20% discount.

6        64.    Unsurprisingly, Downey and D. Ellis are among the March 2015 Noteholders.

7        65.    Additionally, the March 2015 Notes, which amount to self-dealing by corporate
8 insiders, were entered into without convening a meeting of the Board of Directors (or the
9 shareholders) to review and/or vote on whether to enter the transaction.

10       **D.    The Stock Incentive Plan**

11       66.    Shortly thereafter, despite the fact that the March 2015 10-Q stated that "there is
12 substantial doubt the Company will be able to continue as a going concern without additional
13 sources of funding, which the Company might not be able to obtain," Defendants caused the
14 Company to reward themselves with additional restricted common stock.

15       67.    On or about April 19, 2015, without holding a meeting or a vote of the Board of
16 Directors, Defendants caused Massive to adopt the purported "2015 Omnibus Stock Incentive
17 Plan" (the "2015 Plan").

18       68.    According to the March 2015 10-Q, the 2015 Plan provides for the grant of
19 restricted stock, stock options, stock appreciation rights, and other stock-based awards to, *inter
20 alia*, the officers and directors, employees, and consultants of Massive.

21       69.    On or about April 29, 2015, pursuant to the 2015 Plan, Defendants caused the
22 Company to issue an aggregate of 27,289,625 restricted shares of its common stock to Furlong
23 (12,219,235 shares), Ramsay (5,295,002 shares), Drosin (4,887,694 shares), and M. Ellis
24 (4,887,694 shares).

25       70.    The 2015 Plan represented the latest in a series of rapid steps in which Defendants,
26 using their position as directors, purported directors, and/or officers of the Company, continued to
27 loot the corporate treasury, through the issuance of stockholdings to themselves and the
28 consummation of sham transactions.

### III. Defendants Refuse To Call Board Meeting or Recognize Scherr as a Board Member

71. Around the same time that Defendants were engaging in self-dealing and sham transactions, Massive's management team stopped communicating with Southport Lane Equity's management team.

72. As a result, on or about February 4, 2015, Southport Lane Equity wrote to Downey noting the Bylaw requirement for an annual meeting and requesting that such meeting take place as soon as possible, with proper notice given, as required under Article III, Section 7 of the Bylaws.

73. Under Article III, Section 2 of Massive's Bylaws, the annual meeting of Massive's stockholders must be held on a Thursday, the week before Thanksgiving, annually if not a legal holiday, and if a legal holiday, then on the next secular day, when the stockholders must elect a Board of Directors. And, if the annual meeting for election of directors is not held on the date designated by the Bylaws, the Board of Directors must cause a meeting to be held as soon thereafter as convenient.

74. Based on the terms of the Bylaws, Massive was required to hold an annual meeting of the stockholders on or about November 20, 2014, but no such meeting was held by Massive.

75. On or about February 19, 2015, Southport Lane Equity wrote again to Downey because he had failed to respond to Southport Lane Equity's earlier request for a meeting.

76. On or about February 23, 2015, Southport Lane Equity received an email from David Mannheim of Wyrick Robbins Yates & Ponton, LLP ("Wyrick"), which purported to represent Massive. While he acknowledged that Massive did not hold an annual meeting of the stockholders, as required under the Bylaws, and stated that Massive intended to hold a meeting in 2015, he did not announce the timing of the meeting, instead stating that Southport Lane Equity would be noticed of the time and place in advance of the meeting.

77. Unsatisfied with the ambiguity of Massive's purported plan to call an annual shareholder meeting sometime in 2015, on or about February 27, 2015, Scherr, as a Director of Massive, wrote to Downey, noting that it had been nearly four months since the last formal or informal meeting of the Board of Directors of Massive and that Article IV, Section 2 of Massive's Bylaws required the Board of Directors to meet at least once a quarter. In the same letter, invoking

his power under Article IV, Section 3 of the Bylaws, Scherr called for a special meeting of the Board of Directors by no later than March 10, 2015.

78.  Massive failed to respond to Scherr's letter demanding a special meeting of the Board of Directors.

79.  On or about March 18, 2015, Scherr again wrote to Downey, noting Massive's failure to respond to his previous letter and demanding that a special meeting of the Board of Directors be scheduled as soon as possible.

80.  On or about March 23, 2015, Daniel Tracey of Wyrick responded to Scherr, stating that Scherr's "claim to be member [*sic*] of the Board of Directors of Massive Interactive, Inc." was "contrary to our current understanding as we do not recognize you as a sitting director."  The letter, ignoring the Company's previously-filed SEC filings and other documentation, requested Scherr provide "the facts upon which you believe that you are a member of the Massive Board of Directors."  The letter provided absolutely no basis for Mr. Tracey's statement that Scherr was no longer recognized as a sitting Board Member and no shareholder vote was held regarding removal of Scherr as a Board Member, as required by NRS 78.335.

81.  Finally, on or about April 3, 2015, Massive filed the 2014 10-K, which failed to list Devers or Scherr as members of the Board of Directors of the Company and which listed D. Ellis and Ramsay as purported new members of the Board of Directors.

82.  Defendants' failure to recognize Scherr or Devers as members of the Board of Directors of Massive violates the Company's Bylaws as:  (i) no meeting of the Board of Directors or the shareholders of Massive was held concerning the removal of Devers or Scherr as members of the Board of Directors of Massive; (ii) no vote was taken concerning the removal of Devers or Scherr as members of the Board of Directors of Massive; and (iii) no vote was held electing any new members (e.g., D. Ellis and Ramsay) to the Board of Directors of Massive.

83.  Scherr remains a duly-elected, and current, member of the Board of Directors of Massive.

84.  To date, Massive has failed to hold a meeting of the legitimate, duly-elected members of the Board of Directors, nor has it held an annual shareholder meeting for 2014 or

2015, all the while Defendants continue to use their positions as officers and directors to loot Massive's treasury and dilute Southport Lane Equity's equity in the Company.

**IV.     Demand Futility**

85.    The series of improper self-dealing transactions alleged above, as well as the refusal to hold a meeting of the shareholders or the Board of Directors and the refusal to recognize Scherr as a Board member, were caused by Defendants, who make up the majority of Massive's current purported Board of Directors.

86.    In other words, the majority of the Board of Directors is beholden to directors or purported directors who would be liable if the allegations in this action are proven to be true at trial.

87.    In light of (a) Defendants' misconduct in (i) engaging in numerous acts of self-dealing, undertaken without a meeting or vote of the Board of Directors, (ii) refusing to hold meetings of the shareholders and/or Board of Directors, and (iii) refusing to recognize Scherr as a member of the Board of Directors, and (b) the fact that several of Defendants make up the majority of the Board of Directors, whose consent is required for Massive to commence an action against Defendants for breach of fiduciary duty, the Board of Directors would not be able to exercise its independent and disinterested business judgment in responding to a demand to sue Defendants for breach of fiduciary duty

88.    Thus, Plaintiff did not make a demand on the Board of Directors of Massive to bring this action because such demand would have been futile.

89.    Plaintiff, as a shareholder of 55,000,000 common shares of Massive, is not required to make a futile demand.

**FIRST CAUSE OF ACTION**

**Breach of Fiduciary Duty (Derivative)**

90.    Plaintiff repeats and realleges paragraphs 1 through 89 of this Complaint as if fully set forth herein.

91.    Each Defendant owed fiduciary duties, including the duty to exercise their power as officers and directors in good faith and with a view to the interest of Massive.

92. Defendants breached their fiduciary duty owed to Massive, including by purporting to cause Massive to enter in to the Wunderkind Transaction, the Orbach Note and Orbach Warrants, the Private Offering, and the Stock Incentive Plan.

93. Massive sustained damages as a proximate cause of the breach, including in that Massive's equity was used to purchase assets for amounts substantially in excess of their value to Massive.

94. As a result of having to bring this action, Southport Lane Equity has incurred and will continue to incur general and compensatory damages, attorneys' fees and costs and is entitled to recover those damages.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty (Direct)

95. Plaintiff repeats and realleges paragraphs 1 through 94 of this Complaint as if fully set forth herein.

96. Each Defendant owed a fiduciary duty to exercise their power as officers and directors in good faith and with a view to the interest of Massive. Such duty includes the obligation not to use their positions of control of Massive, including as directors or officers, to further their own personal or financial interests to the detriment of Massive shareholders, including Southport Lane Equity.

97. Defendants breached their fiduciary duty to Massive shareholders.

98. Southport Lane Equity sustained damages as a proximate result of the breach.

99. As a result of having to bring this action, Southport Lane Equity has incurred and will continue to incur general and compensatory damages, attorneys' fees and costs and is entitled to recover those damages.

## THIRD CAUSE OF ACTION

### Declaratory Relief

100. Plaintiff repeats and realleges paragraphs 1 through 99 of this Complaint as if fully set forth herein.

/ / /

101. Nevada Revised Statutes §§ 30.010 to 30.160, inclusive, permits parties to request that a Court determine any question of construction or validity arising under an instrument if such declaration will terminate a controversy or remove an uncertainty.

102. A justiciable controversy exists with respect to (1) the membership of Scherr and Devers in the Board; (2) the identity of the current proper members of the Board; (3) the validity of the Wunderkind Transaction; (4) the validity of the Private Offering; and (5) the validity of the Stock Incentive Plan.

103. Plaintiff requests a declaration that: (1) Scherr is a proper member of the Board and has been since December 2013; (2) the Wunderkind Transaction is void; (3) the Private Offering is void; and (4) shares acquired by Furlong, Ramsay, Drosin, or M. Ellis or other purported officers or directors pursuant to the Stock Incentive Plan are void.

104. As a result of having to bring this action, Southport Lane Equity has incurred and will continue to incur general and compensatory damages, attorneys' fees and costs and is entitled to recover those damages.

**FOURTH CAUSE OF ACTION**

**Unjust Enrichment**

105. Plaintiff repeats and realleges paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Massive and its shareholders, including by usurping company value for themselves through self-dealing transactions and by purporting to dilute Southport Lane Equity's interest in Massive.

107. Plaintiff, as a shareholder and representative of Massive, seeks restitution from Defendants, each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, each of them, from their wrongful conduct and fiduciary breaches.

108. Plaintiff has no adequate remedy at law.

109. As a result of having to bring this action, Southport Lane Equity has incurred and

will continue to incur general and compensatory damages, attorneys' fees and costs and is entitled to recover those damages.

### FIFTH CAUSE OF ACTION

### Receivership Pursuant to Nev. Rev. Stat. § 78.347

110. Plaintiff repeats and realleges paragraphs 1 through 109 of this Complaint as if fully set forth herein.

111. Massive has indicated in its public filings that "there is substantial doubt the Company will be able to continue as a going concern without additional sources of funding, which the Company might not be able to obtain," and therefore Southport Lane Equity believes Massive is insolvent or is approaching insolvency.

112. Southport Lane Equity is a stockholder with the right to apply for appointment of a receiver of Massive because Massive appears to be insolvent, and because Massive has admitted that the continuing viability of Massive is threatened at this time. Additionally, the business of the corporation is threatened with irreparable injury because there is a dispute regarding the identity of persons on the Board and therefore serious questions about the legitimacy of actions taken by the purported Board. There is also a dispute about the legitimacy of certain additional stock of the Company that appears to have been issued. The stockholders cannot terminate this division and therefore a receiver is also appropriate in order to take over the duties of the officers and directors and restore legitimacy to the corporate activities of Massive. Therefore, Southport Lane Equity requests that the Court appoint a receiver to take control of the Board of Directors and cause the Company to comply with its Bylaws and Nevada law.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial as to all issues so triable.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

i. A declaratory judgment that

    a. Scherr is a proper member of the Board and has been since December 2013;

    b. the Wunderkind Transaction is void and rescinded;

      c.      the Private Offering is void and rescinded; and

      d.      shares acquired by Furlong, Ramsay, Drosin, or M. Ellis or other purported officers or directors pursuant to the Stock Incentive Plan are void and rescinded;

ii.    Appointment of a receiver, pursuant to Nev. Rev. Stat. § 78.347;

iii.    Damages exceeding $75,000 in an amount to be determined by the Court but reasonably believed to be in excess of $5,500,000, attorneys' fees, costs and expenses; and

iv.    An accounting of Defendants' profits related to the above-described conduct;

v.    Access to all books and records to the full extent permitted by the Bylaws;

vi.    For all other relief as to which this Court deems just and equitable.

DATED: June 23, 2015

**FENNEMORE CRAIG, P.C.**

By: /s/ Courtney Miller O'Mara
Leslie Bryan Hart, Esq.
State Bar No. 4932
Courtney Miller O'Mara, Esq.
State Bar No. 10683
300 East Second Street - Suite 1510
Reno, Nevada 89501
Tel: (775) 788-2200
lhart@fclaw.com
comara@fclaw.com

Nicholas M. Menasché, Esq.
(will comply with LR IA 10-2 within 7 days.)
ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.
875 Third Avenue, 9th Floor
New York, New York 10022
Tel: (212) 603-6300
nmm@robinsonbrog.com

*Attorneys for Plaintiff Southport Lane Equity II, LLC*

FENNEMORE CRAIG, P.C.
300 East Second Street - Suite 1510
Reno, Nevada 89501
Tel: (775) 788-2200   Fax: (775) 786-1177