**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

_____

SOUTHPORT LANE EQUITY II, LLC et al.,

           Plaintiffs,

      vs.

DOWNEY et al.,

          Defendants.
_____

3:15-cv-0335-RCJ-VPC

**ORDER**

This case is a derivative shareholder suit arising out of several transactions made by a company's board of directors. Plaintiff Southport Lane Equity II, LLC makes five claims—direct and derivative—against directors and officers of Nominal Defendant Massive Interactive, Inc. Pending before the Court are five Motions to Dismiss, each filed by one or more of the eight Defendants (ECF Nos. 19, 28, 29, 30, 31).

I.      **FACTS AND PROCEDURAL HISTORY**

Plaintiff Southport Lane Equity II, LLC ("Southport") is suing individually and derivatively on behalf of Massive Interactive, Inc. ("Massive") the following individuals it alleges are officers and/or directors of Massive: Ron Downey ("Downey"), Derek Ellis ("D. Ellis"), Max Ramsay ("Ramsay"), Monique Ellis ("M. Ellis"), Dominic De Lorenzo ("De Lorenzo"), Alex Drosin ("Drosin"), and Antaine Furlong ("Furlong"). Massive is a nominal

defendant. Southport is a Delaware limited liability company with offices in New York City, and Massive is a Nevada corporation with executive offices and place of business in London and additional offices in New York, Sydney, and Prague. (Am. Compl. ¶ 5, ECF No. 6, at 14). Defendant Drosin resides in New York City, whereas the other individual Defendants reside in the United Kingdom. (*Id.* ¶¶ 7–13). Drosin is the president for Massive in North America, whereas Downey, Furlong, D. Ellis, and Ramsay are officers and directors of Massive. (*Id.*). M. Ellis is a senior vice president of Massive, and De Lorenzo is a director of product strategy. (*Id.*).

On November 7, 2013, Southport purchased 55,000,000 shares of common stock of Xtreme Oil & Gas, Inc. ("Xtreme"), a publicly traded Nevada corporation, which gave Southport ownership of ninety percent of Xtreme's common stock. (*Id.* ¶¶ 21–22). On November 15, 2013, Xtreme purchased the outstanding equity in Massive Media Pty. Limited ("Massive Media") for $4,167,190. (*Id.* ¶ 23). Simultaneously, Southport reverse merged Massive Media into Xtreme and directed Xtreme to change its name to Massive. (*Id.* ¶¶ 24–25). As a result, Southport owned ninety percent of Massive's outstanding shares. (*Id.* ¶ 26).

Southport alleges that Defendants "engage[d] in a series of transactions that were designed to loot the corporate treasury . . . in breach of their fiduciary duties . . . while diluting the shares of . . . Southport." (*Id.* ¶ 32).

A.     **Wunderkind Transaction**

On May 1, 2014, Defendants caused Massive to purchase Wunderkind Group Pty. Ltd. ("Wunderkind"), an Australian company owned and controlled by Downey, M. Ellis, and De Lorenzo, in exchange for a convertible promissory note worth $5.5 million ("the Wunderkind Note"). (*Id.* ¶¶ 35, 37). Southport alleges the transaction took place without a formal meeting of the Board of Directors of Massive ("Board"), even though a letter of intent required the Board's

approval and written consent. (*Id.* ¶¶ 41–42). On April 24, 2015, Defendants caused Massive to amend the Wunderkind Note to allow Defendants Downey, M. Ellis, and De Lorenzo to convert the Note's outstanding principle to shares of Massive common stock (equal to forty-five percent of Massive's outstanding common stock) if Massive did not repay the Note. (*Id.* ¶ 47). Southport alleges the amendment occurred without a meeting of the Board and a vote of disinterested directors, and that the Wunderkind transaction was a "sham transaction" designed to increase Defendants' interest in Massive while diluting Southport's interest. (*Id.* ¶¶ 49–50).

### B.   October 2014 Financing

On October 24, 2014, Defendants caused Massive to enter an agreement with Gil Orbach by which Orbach would pay $1,000,000 for a promissory note and warrants to purchase 100,000 shares of Massive's common stock. (*Id.* ¶ 53). The note is senior to obligations owed to other creditors and cannot be subordinated without Orbach's written approval. (*Id.* ¶ 54). Southport alleges that Defendants entered the transaction without convening a meeting of the Board, even though the issuance of stock requires Board approval. (*Id.* ¶¶ 57–58).

### C.   Private Offerings to D. Ellis and Downey

On March 23, 2015, Massive offered convertible promissory notes in the amount of $636,310 to multiple investors, including Downey and D. Ellis. (*Id.* ¶¶ 60, 64). The notes bear an interest rate of twelve percent and are secured by a first priority lien on Massive's assets. (*Id.* ¶ 61–62). The notes also contained provisions for a purchase premium in the event of liquidation, liquidated damages if the note remained unpaid after December 31, 2015, and an option to convert the principal and accrued interest into shares of securities sold during qualified financing, with a twenty percent discount. (*Id.* ¶ 63). Southport alleges the notes were "self-

1   dealing by corporate insiders" and were entered into without a meeting or approval of the Board.

2   (*Id.* ¶ 65).

3       **D.**    **Stock Incentive Plan**

4       On April 29, 2015, Massive issued restricted shares of common stock to Furlong,

5   Ramsay, Drosin, and M. Ellis. (*Id.* ¶ 69). Southport alleges Defendants used their position as

6   directors and officers to issue the stock to themselves without a meeting or vote of the Board,

7   even though the company was experiencing financial difficulty. (*Id.* ¶¶ 66–67, 70).

8       Massive's bylaws require the Board to hold an annual meeting of stockholders on or

9   about November 20, 2014, which it failed to do as requested by Southport. (*Id.* ¶¶ 72–74).

10   Andrew Scherr ("Scherr"), Southport's designee to the Board, contacted Downey about holding

11   a Board meeting and called for a special meeting of the Board by no later than March 10, 2015.

12   (*Id.* ¶¶ 75–77). Massive's counsel informed Scherr it did not consider him to be a sitting director

13   and asked him to provide facts showing he was a director. (*Id.* ¶ 80). Southport argues the failure

14   to recognize Scherr as a director violates Massive's bylaws, as well as its failure to hold a board

15   meeting or annual shareholder meeting in 2014 or 2015. (*Id.* ¶¶ 82–84). Southport argues that a

16   demand that the Board sue Defendants for breach of fiduciary duty would have been futile

17   because it "would not be able to exercise its independent and disinterested business judgment."

18   (*Id.* ¶¶ 87–88).

19       Southport brings five causes of action: (1) breach of fiduciary duty (derivative); (2)

20   breach of fiduciary duty (direct); (3) request to declare Scherr as a member of the Board since

21   December 2013 and to declare void the Wunderkind transaction, the private offerings, and stock

22   incentive plan; (4) unjust enrichment; and (5) request for an appointment of a receivership for

23   Massive. Six Defendants have filed a motion to dismiss: Alex Drosin (ECF No. 19); Massive

24

(ECF No. 28); Monique Ellis (ECF No. 29); Max Ramsay and Antaine Furlong (ECF No. 30); and Ron Downey (ECF No. 31). The individual Defendants all raise as a defense lack of personal jurisdiction under Federal Rule of Procedure 12(b)(2). Drosin, Massive, M. Ellis, and Ramsay and Furlong raise as a defense failure to state a claim upon which relief can be granted under Federal Rule of Procedure 12(b)(6). Drosin, Massive, and Ramsay and Furlong argue for protection under the business judgment rule and that Southport has not pleaded demand or demand futility. Massive also argues Southport's claims are direct claims and, thus, it has no right to assert breach of fiduciary duty claims derivatively on behalf of Massive.

## II.    LACK OF PERSONAL JURISDICTION UNDER RULE 12(b)(2)

### A.    Legal Standards

A defendant may move to dismiss for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). Jurisdiction exists if: (1) provided for by law; and (2) the exercise of jurisdiction comports with due process. *See Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1207 (9th Cir. 1980). When no federal statute governs personal jurisdiction, a federal court applies the law of the forum state. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Where a state has a "long-arm" statute providing its courts jurisdiction to the fullest extent permitted by the Due Process Clause of the Fourteenth Amendment, as Nevada does, *see Arbella Mut. Ins. Co. v. Eighth Judicial Dist. Court*, 134 P.3d 710, 712 (Nev. 2006) (citing Nev. Rev. Stat. § 14.065), a court need only address federal due process standards, *see Boschetto*, 539 F.3d at 1015. Technically, Nevada's long-arm statute restricts extra-territorial jurisdiction to the limits of both the U.S. and Nevada Constitutions. *See* Nev. Rev. Stat. § 14.065(1). But Nevada's Due Process Clause is textually identical to the Due Process Clause of the Fourteenth Amendment in relevant respects, *compare* U.S. Const. amend. XIV, § 1, *with* Nev. Const. art. 1, § 8(5), and the Nevada

Supreme Court reads the state clause as coextensive with the federal clause, *see, e.g.*, *Wyman v. State*, 217 P.3d 572, 578 (Nev. 2009). Until the Fourteenth Amendment was adopted in 1868, no federal due process clause applied to the states. *See Barron v. City of Baltimore*, 32 U.S. 243, 250–51 (1833) (Marshall, C.J.). The Declaration of Rights comprising Article I of the Nevada Constitution, which was adopted in 1864, was included in order to impose certain restrictions on the State of Nevada that were already imposed against the federal government under the Bill of Rights, and the Nevada Supreme Court has not interpreted the protections of the Declaration of Rights to exceed the scope of their federal counterparts. Michael W. Bowers, *The Sagebrush State* 43–44 (3rd ed., Univ. Nev. Press 2006); Michael W. Bowers, *The Nevada State Constitution* 24 (1993). In summary, the exercise of personal jurisdiction in Nevada need only comport with the Due Process Clause of the Fourteenth Amendment.

### 1.    General Jurisdiction

There are two categories of personal jurisdiction: general jurisdiction and specific jurisdiction. In the mid-to-late-Twentieth Century, the federal courts developed a rule that general jurisdiction existed over a defendant in any state with which the defendant had "substantial" or "continuous and systematic" contacts such that the assertion of personal jurisdiction over him would be constitutionally fair even where the claims at issue were unrelated to those contacts. *See Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1171 (9th Cir. 2006) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984)). A state court has general jurisdiction over the state's own residents, for example. The Supreme Court recently clarified, however, that general jurisdiction exists only where the defendant is at "home" in the forum state. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 760–62 (2014). The Court noted that "continuous and systematic" contacts alone are not enough to create general jurisdiction

without more. *See id.* The quoted phrase was in fact first used in the context of a specific

jurisdiction analysis. *See id.* at 761 (citing *Int'l Shoe Co. v. State of Wash., Office of*

*Unemployment Comp. & Placement*, 326 U.S. 310, 317 (1945)). "Accordingly, the inquiry under

*Goodyear* is not whether a foreign [defendant's] in-forum contacts can be said to be in some

sense 'continuous and systematic,' it is whether that [defendant's] 'affiliations with the State are

so "continuous and systematic" as to render [the defendant] essentially at home in the forum

State.'" *Id.* (quoting *Goodyear Dunlop Tires Operations S.A. v. Brown*, 131 S. Ct. 2846, 2851

(2011)).

## 2.     Specific Jurisdiction

Even where there is no general jurisdiction over a defendant, specific jurisdiction exists

when there are sufficient contacts with the forum state such that the assertion of personal

jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*

*Co.*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The standard has

been restated using different verbiage. *See World-wide Volkswagen Corp. v. Woodson,* 444 U.S.

286, 297 (1980) ("[T]he foreseeability that is critical to due process analysis is not the mere

likelihood that a product will find its way into the forum State.  Rather, it is that the defendant's

conduct and connection with the forum State are such that he should reasonably anticipate being

haled into court there."); *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("[I]t is essential in each

case that there be some act by which the defendant purposefully avails itself of the privilege of

conducting activities within the forum State, thus invoking the benefits and protections of its

laws."). From these cases and others, the Court of Appeals has developed a three-part test for

specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform

some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Boschetto*, 539 F.3d at 1016 (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)) (internal quotation marks omitted).

The plaintiff bears the burden on the first two prongs.  If the plaintiff establishes both prongs one and two, the defendant must come forward with a "compelling case" that the exercise of jurisdiction would not be reasonable.  But if the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed.

*Id.* (citations omitted).

The "purposeful direction" option of the first prong uses the "*Calder*-effects" test, under which "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir.2006) (en banc)). The tortious activity must be aimed at a forum state to create personal jurisdiction over a defendant in that state; it is not enough that the activity occurs in another state but causes harm known or expected by the defendant to be felt by a resident of the forum state in the forum state. The second and third prongs of the *Calder*-effects test are conjunctive, not disjunctive. That is, a defendant must not only cause harm to a person who he knows will feel a "judicially sufficient amount of harm" in the forum state (the third prong), *see Yahoo! Inc.*, 433 F.3d at 1207, the intentional activity must be directed to the forum state itself (the second prong). Activity is not "aimed at" a forum state merely because it is expected that its effects will be felt

there, otherwise the third prong of the *Calder*-effects test would swallow the second.  The prongs are distinct and conjunctive.

The Supreme Court has recently reaffirmed that "purposeful direction" or "express aiming" is not satisfied merely by a defendant committing an intentional tort against a plaintiff he knows is a resident of the forum state and that the effects of the act will be felt in that state. *See Walden v. Fiore*, 134 S. Ct. 1115, 1124 (2014) (reinstating Judge Reed's ruling, after reversal by the Court of Appeals, that there was no personal jurisdiction in Nevada over Georgia defendants who allegedly committed an intentional tort in Georgia against a person they knew was a Nevada resident where the tortious activity had no other connection to Nevada) ("[T]he relationship must arise out of contacts that the 'defendant *himself* ' creates with the forum State." (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (emphasis in *Walden*)). In *Calder* itself, not only was it known that the effects of the libelous article would be felt in California (because the defendant knew the plaintiff resided there), but the article was also expressly aimed at California (because the defendant in fact circulated the article there). *See Calder v. Jones*, 465 U.S. 783, 784, 789–90 (1984). That is, the effects of the libel did not merely find their way to the California plaintiff in a way the defendant should have anticipated after libeling her in another state; rather, the defendant actually libeled the plaintiff in California by causing the circulation of the article in that state. *See id.*

The third prong is a seven-factor balancing test, under which a court considers:

(1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Menken v. Emm*, 503 F.3d 1050, 1060 (9th Cir. 2007) (quoting *CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 107, 1112 (9th Cir. 2004)) (internal quotation marks omitted).

### B.  Analysis

The individual Defendants argue this Court lacks personal jurisdiction over them because their contacts with the State of Nevada are insufficient for either general or specific jurisdiction. Southport asserts only that the Court has specific jurisdiction over Defendants.

#### 1.  *Consipio*

Southport argues the Court does have personal jurisdiction based on the Nevada Supreme Court's holding in *Consipio Holding, BV v. Carlberg*, 282 P.3d 751 (2012). In *Consipio*, the shareholders of a Nevada corporation, with its principal place of business in Spain, brought a derivative action in the Nevada district court against the former CEO and other officers and directors of the company, alleging they were guilty of misfeasance, malfeasance, and breach of their fiduciary duties. *Id.* at 753–754. The court held that Nevada courts "can exercise personal jurisdiction over nonresident officers and directors who directly harm a Nevada corporation." *Id.* at 757. It reasoned:

> [w]hen officers or directors directly harm a Nevada corporation, they are harming a Nevada citizen. By purposefully directing harm towards a Nevada citizen, officers and directors establish contacts with Nevada and affirmatively direct conduct toward Nevada. Further, officers or directors cause important consequences in Nevada when they directly harm a Nevada corporation.

*Id.* at 755 (internal quotation omitted). The court distinguished *Consipio* from *Shaffer v. Heitner*, 433 U.S. 186 (1977), saying *Shaffer* was different because the Supreme Court held that Delaware courts had no personal jurisdiction over the defendant simply because the defendant's property was located in Delaware. *Consipio*, 282 P.3d at 755. According to the court, "the property was not the matter of the litigation and the plaintiff did not 'identify any act related to his cause of action as having taken place in Delaware.'" *Id.* (quoting *Shaffer*, 433 U.S. at 213).

Both parties cite unpublished cases from the District of Nevada to support their position that either *Consipio* applies in this case or does not. However, these cases are not binding on this Court and, in any event, they are inconclusive on the question. *See, e.g.*, *Advanced Vision Sols., Inc. v. Lehman*, No. 2:14-CV-01597-APG, 2015 WL 316951, at *3 (D. Nev. Jan. 26, 2015) ("I find persuasive the Supreme Court of Nevada's reasoning in *Consipio*"); *HPEV, Inc. v. Spirit Bear Ltd.*, No. 2:13-CV-01548-JAD, 2014 WL 6634838, at *3–4 (D. Nev. Nov. 21, 2014) (applying *Consipio* to a derivative shareholder suit); *Andes Indus., Inc. v. Chen Sun Lan*, No. 2:14-CV-00400-APG, 2014 WL 6611227, at *7 (D. Nev. Nov. 19, 2014) ("the undersigned believes that *Consipio* . . . is contrary to the United States Supreme Court's decision in *Shaffer v. Heitner*, and that a court does not have personal jurisdiction over nonresident shareholders based solely on the fact that the plaintiff is incorporated in the forum"); *Andes Indus., Inc. v. Cheng Sun Lan*, No. 2:14-CV-00400-APG, 2015 WL 1397727, at *4 (D. Nev. Mar. 25, 2015) ("*Consipio*, a case Magistrate Judge Foley already cautioned against using, does not apply.").

Even if the Nevada Supreme Court believes its holding comports with Nevada law[1] and federal precedents, this Court must conduct its own independent inquiry to determine whether the Due Process Clause allows nonresident officers and directors of a Nevada corporation to be subject to personal jurisdiction in the U.S. District of Nevada. In *Shaffer*, a shareholder filed a derivative suit in Delaware against a Delaware corporation with its principal place of business in Arizona based on activities which took place in Oregon. 433 U.S. at 189–90. Based on a Delaware statute allowing a Delaware court to take jurisdiction of a suit by sequestering a defendant's property located in Delaware, a Delaware court sequestered the common stock of the defendants who were present or former officers of the corporation and claimed jurisdiction over

---

[1] *See* Nev. Rev. Stat. § 14.065; § 78.135.

1   the suit. *Id.* The Supreme Court held that basing personal jurisdiction solely on the presence of

2   the defendants' property, which had no relation to the litigation, did not provide contacts

3   sufficient to satisfy due process. *Id.* at 213. The Court noted that the plaintiff had not alleged that

4   the defendants had ever set foot in Delaware or that any act related to the litigation took place in

5   Delaware. *Id.*

6           The Court also rejected the plaintiffs' argument that Delaware should have jurisdiction

7   over the defendants due to their positions as directors and officers of the corporation because of

8   the state's strong interest in supervising a Delaware corporation; specifically, the state's role "in

9   establishing the corporation and defining the obligations owed to it by its officers and directors."

10  *Id.* at 213–214. According to the Court, Delaware had asserted no such interest through state law;

11  rather it based its claim to jurisdiction on the presence of property in the state.[2] *Id.* at 214. The

12  Court noted, however, that merely enacting a state statute that declares the state's interest in

13  supervising corporations is insufficient for personal jurisdiction. It held that the importance of

14  this interest, or "by accepting positions as officers or directors of a Delaware corporation,"

15  "establishes only that it is appropriate for Delaware law to govern the obligations of [the

16  defendants] to [the corporation] and its stockholders. It does not demonstrate that [the

17  defendants] have 'purposefully avail(ed themselves) of the privilege of conducting activities

18  within the forum state.'" *Id.* at 215–16 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

19  Thus, based on *Shaffer*, a state's explicitly asserted interest in supervising its corporations is

20

21

22

23  [2] The Court stated: "If Delaware perceived its interest in securing jurisdiction over corporate
    fiduciaries to be as great as Heitner suggests, we would expect it to have enacted a statute more
24  clearly designed to protect that interest." *Id.* at 214–15.

insufficient to satisfy due process, even when the state has "enacted a statute that treats

acceptance of a directorship as consent to jurisdiction in the State."[3] *Id.* at 216.

       In *Consipio*, the Nevada Supreme Court focused on the existence of Nevada's statute that

"authorizes lawsuits 'against the officers or directors of the corporation for violation of their

authority.'" 282 P.3d at 756 (quoting Nev. Rev. Stat. 78.135(1)). However, it also held that

"[o]fficers or directors who directly harm a Nevada corporation are affirmatively directing

conduct toward Nevada, and by doing so can be subject to personal jurisdiction even without a

director consent statute." *Id.* This holding runs contrary to *Shaffer* because in *Shaffer* the Court

held that without a director consent statute personal jurisdiction is clearly improper. At a

minimum, a state must enact a director consent statute, but such a statute only provides

additional support for a state's jurisdiction over its corporations' officers and directors; alone, the

statute is insufficient. In other words, *Shaffer* requires more than a state's assertion of jurisdiction

and an interest in its corporations; the acts of a defendant must show the defendant's

involvement with the state was more than simply being a shareholder, director, or officer of one

of the state's corporations.[4]

---

[3] The existence of the statute could indicate that officers or directors may expect to be haled before a specific state court, but this fact alone is insufficient for personal jurisdiction because the state may still not be a "fair forum for . . . litigation." *Id.* at 215.

[4] The Nevada Supreme Court seemed to agree with this assessment to some degree:

    The district court held hearings based on the motions to dismiss where it granted the motions, stating that an individual's position as a Nevada corporation's director *does not automatically* subject that individual to jurisdiction in Nevada. *While we agree with this statement*, the district court needed to conduct further factual analysis in order to determine whether the respondents' conduct subjected them to jurisdiction in Nevada.

*Consipio*, 282 P.3d at 757 (emphasis added).

2.     *Walden v. Fiore*

The case *Walden v. Fiore*, 134 S. Ct. 1115 (2014) buttresses this conclusion. In *Walden*,
an officer in Atlanta, GA seized cash from airline passengers who were traveling to their home in
Nevada. *Id.* at 1119. The passengers filed suit against the officer in the District of Nevada. *Id.* at
1120. The Supreme Court held that the defendant "lack[ed] the 'minimal contacts' with Nevada
that are a prerequisite to the exercise of jurisdiction over him." *Id.* at 1124. According to the
Court, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is
the defendant's conduct that must form the necessary connection with the forum State that is the
basis for its jurisdiction over him." *Id.* at 1122. In other words, "a defendant's relationship with a
plaintiff or third party, standing alone, is an insufficient basis for jurisdiction," *id.* at 1123; "the
relationship must arise out of contacts that the 'defendant *himself* ' creates with the forum State,"
*id.* at 1122 (emphasis in original). In addition, the Court stated that "[d]ue process requires that a
defendant be haled into court in a forum State based on his own affiliation with the State, not
based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other
persons affiliated with the State." *Id.* at 1123.

Based on these findings, the Court held that the Nevada courts had no jurisdiction over
the suit because

> no part of petitioner's course of conduct occurred in Nevada . . . . Petitioner never
> traveled to, conducted activities within, contacted anyone in, or sent anything or
> anyone to Nevada. In short, when viewed through the proper lens—whether the
> *defendant's* actions connect him to the *forum*—petitioner formed no
> jurisdictionally relevant contacts with Nevada.

*Id.* at 1124. The Court continued, "Petitioner's actions in Georgia did not create sufficient
contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he
knew had Nevada connections." *Id.* at 1125. Finally, the Court reaffirmed its holding in *Calder*:

> mere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

*Id.* at 1125; *see also Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (applying these principles from *Walden*).

The conclusion that injury to one of Nevada's corporate citizens alone is sufficient for personal jurisdiction is incorrect. A defendant's personal contacts with the forum state are the decisive factor; a mere connection between a defendant and a plaintiff that has contacts with the forum state or that has been injured in the state is insufficient for personal jurisdiction under the Due Process Clause. Subjecting the directors or officers of a corporation to jurisdiction in any forum in which a corporation operates or is incorporated when the directors or officers have no personal contacts whatsoever with the forum state denies them due process protection. To exercise personal jurisdiction over a nonresident officer or director of a Nevada corporation, a defendant must have some contact with the forum state that is related to or gave rise to the cause of action. Mere affiliation with the corporation is not enough.

### 3.   The Individual Defendants

Here, Southport alleges only that "Massive is a Nevada corporation with its executive offices and place of business in London and additional offices in New York, Sydney and Prague." (Am. Compl. ¶ 14). Defendants argue that Massive is "a phantom Nevada corporation" and that "any injury to Massive would be felt in London, Sydney, and Prague." (Mot. to Dismiss, Alex Drosin, 14, ECF No. 19). They assert that "[a]lthough Massive is a nominal Nevada corporation, it does not maintain any offices in Nevada nor do any of its officers or director[s] reside in the state. Massive operates exclusively from its offices in London, Sydney, and Prague,

and it does not keep any assets in Nevada." (Decl. of A. Drosin ¶ 11, ECF No. 20; Decl. of M. Ellis ¶ 9, ECF No. 29-1; Decl. of M. Ramsay ¶ 11, ECF No. 30-1; Decl. of A. Furlong ¶ 8, ECF No. 30-2; Decl. of R. Downey ¶ 11, ECF No. 21-1). They also declare that Massive's only connection to Nevada was its reverse merger into Xtreme, and that before the merger "Massive Media never conducted any business operations in Nevada." (Decl. of A. Drosin ¶ 12; Decl. of M. Ellis ¶ 10; Decl. of M. Ramsay, ¶ 12; Decl. of A. Furlong ¶ 9; Decl. of R. Downey ¶ 12). Southport retorts that "Massive is a publicly-traded U.S. company that has taken every advantage of the benefits and protections of the State of the Nevada and is regulated by the Securities and Exchange Commission." (Resp., 3, ECF No. 46). Importantly, what matters most in this analysis is not the corporation's own contacts with Nevada but the individual Defendants' contacts with the State. The Defendants' mere affiliation with Massive, a Nevada corporation, is insufficient.

### a. Alex Drosin

Defendant Alex Drosin makes the following declarations pertaining to personal jurisdiction:

- "I reside in New York and have since 1991." (Decl. of A. Drosin ¶ 1);

- "I conduct almost all of my business for Massive from my home in New York or in Massive's offices located in London, Sydney, and Prague. I do not have an office in Nevada, nor does Massive." (*Id.* ¶ 6);

- "Each year I attend a three-day trade show in Las Vegas, Nevada known as the Consumer Electronic Show ("CES"). I have attended CES since the January 2012 show. Attendance at CES annually is my only connection to Nevada." (*Id.* ¶ 7);

- "CES organizers estimated that 170,000 people attended the 2015 show . . . . The overwhelming majority of these attendees come from outside Nevada." (*Id.* ¶ 8);

- "CES is my only professional contact with Nevada as I do not otherwise conduct any business for Massive or any other client in Nevada, nor do I communicate with anyone in the state in a professional capacity on Massive's behalf or anyone else's behalf." (*Id.* ¶ 9);

- "I do not own any personal or real property in Nevada, nor do I have any other personal assets in the State" (*Id.* ¶ 10);

- "To the extent I received stock or stock options from Massive in the 2015 Stock Incentive Plan, I did so exclusively in New York or outside the United States. Regarding my alleged involvement in the 2015 Stock Incentive Plan, I did not perform any of the alleged acts in Nevada." (*Id.* ¶ 17).

According to these declarations, the only connection Drosin has to Nevada is his annual attendance at the CES trade show. Drosin declares that the "overwhelming majority of these attendees come from outside Nevada" and that he does not "communicate with anyone in the state in a professional capacity." (*Id.* ¶¶ 8–9). Further, he declares, "I did not perform any of the alleged acts in Nevada." (*Id.* ¶ 17). Southport has made no allegations that Drosin has conducted any business in Nevada, or any allegations that its claims arise out of or are related to any of Drosin's forum-related activities, including attendance at the trade show. Nothing in the Amended Complaint or declarations gives the Court reason to believe Drosin has expressly aimed at Nevada any conduct associated with Southport's allegations.

Southport asks the Court to allow jurisdictional discovery to help determine whether the Court has personal jurisdiction over Drosin. "Discovery may be appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (quoting *Data Disc, Inc. v. Systems Tech. Assoc, Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977)). "Where a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, the Court need not permit even limited discovery." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1160 (9th Cir. 2006) (quoting *Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995)). A plaintiff "seeking jurisdictional discovery must provide some basis to believe that discovery will lead to relevant evidence providing a basis for the exercise of personal jurisdiction and courts are within

their discretion to deny requests based 'on little more than a hunch that [discovery] might yield jurisdictionally relevant facts.'" *Pfister v. Selling Source, LLC*, 931 F. Supp. 2d 1109, 1118 (D. Nev. 2013) (quoting *Boschetto*, 539 F.3d at 1020).

Here, Drosin has specifically denied he has any contacts with Nevada other than the trade show, that the vast majority of the trade-show attendees come from outside Nevada, and that he did not perform any of the alleged acts in Nevada. Southport argues that jurisdictional discovery "would clarify questions relating to Drosin's . . . conduct in targeting this jurisdiction . . . [and] the frequency of his travel and level of his contacts with the State of Nevada." (Resp., 22, ECF No. 46). While discovery could potentially uncover jurisdictionally relevant facts regarding Drosin's contacts with Nevada, Southport's request is based on "little more than a hunch," especially given Drosin's denial of forum-related activity associated with Southport's allegations. The Court has no personal jurisdiction over Defendant Alex Drosin and denies Southport's request for jurisdictional discovery.

### b.   Monique Ellis

Defendant Monique Ellis makes the following declarations pertaining to personal jurisdiction:

- "I reside in the United Kingdom and have since 2013." (Decl. of M. Ellis ¶ 1);

- "I conduct almost all of my business for Massive from Massive's offices located in London, Sydney, and Prague. I do not have an office in Nevada, nor does Massive." (*Id.* ¶ 6);

- "I have never been to Nevada for professional reasons, as I do not conduct any business for Massive or any other client in Nevada, nor do I communicate with anyone in the state in a professional capacity on Massive's behalf or anyone else's behalf." (*Id.* ¶ 7);

-  "I do not own any personal or real property in Nevada, nor do I have any other personal assets in the State" (*Id.* ¶ 8);

- "To the extent I received stock or stock options from Massive in the 2015 Stock Incentive Plan, I did so exclusively outside the United States. Regarding my alleged involvement in the Wunderkind Transaction and the 2015 Stock Incentive Plan, I did not perform any of the alleged acts in Nevada." (*Id.* ¶ 15).

According to these declarations, M. Ellis has had no professional contact with Nevada and did not perform any of the acts alleged against her in Nevada. As described above, nothing in the pleadings or declarations gives the Court reason to believe M. Ellis has had any contact with Nevada related to Southport's allegations, or even any professional contact with the state at all. The Court has no personal jurisdiction over Defendant M. Ellis and, for the reasons described above, denies Southport's request for jurisdictional discovery.

    **c.**    **Max Ramsay**

Defendant Max Ramsay makes the following declarations pertaining to personal jurisdiction:

- "I reside in the United Kingdom and have since March 2015." (Decl. of Max Ramsay ¶ 1);

- "I conduct almost all of my business for Massive from Massive's offices located in London, Sydney, and Prague. I do not have an office in Nevada, nor does Massive." (*Id.* ¶ 6);

- "Each year I attend a three-day trade show in Las Vegas, Nevada known as the Consumer Electronic Show ("CES"). I have attended CES since the January 2013 show. Attendance at CES annually is my only connection to Nevada." (*Id.* ¶ 7);

- "CES organizers estimated that 170,000 people attended the 2015 show . . . . The overwhelming majority of these attendees come from outside Nevada." (*Id.* ¶ 8);

- "CES is my only professional contact with Nevada as I do not otherwise conduct any business for Massive or any other client in Nevada, nor do I communicate with anyone in the state in a professional capacity on Massive's behalf or anyone else's behalf." (*Id.* ¶ 9);

- "I do not own any personal or real property in Nevada, nor do I have any other personal assets in the State" (*Id.* ¶ 10);

- "To the extent I received stock or stock options from Massive in the 2015 Stock Incentive Plan, I did so exclusively in the United Kingdom or outside the United

States. Regarding my alleged involvement in the 2015 Stock Incentive Plan, I did not perform any of the alleged acts in Nevada." (*Id.* ¶ 15).

Ramsay's declarations are nearly identical to Drosin's declarations. As described above, nothing in the pleadings or declarations gives the Court reason to believe Ramsay has had any contact with Nevada related to Southport's allegations. The Court has no personal jurisdiction over Defendant Max Ramsay and, for the same reasons described above, denies Southport's request for jurisdictional discovery.

### d.   Antaine Furlong

Defendant Antaine Furlong makes the following declarations pertaining to personal jurisdiction:

- "I reside in the United Kingdom and have since 2013." (Decl. of A. Furlong ¶ 1);

- "I conduct almost all of my business for Massive from Massive's offices located in London, Sydney, and Prague. I do not have an office in Nevada, nor does Massive." (*Id.* ¶ 6);

- "I have never been to Nevada, nor do I own any personal or real property in Nevada. I also have no personal assets in the State." (*Id.* ¶ 7);

- "To the extent I received stock or stock options from Massive in the 2015 Stock Incentive Plan, I did so exclusively outside the United States. Regarding my alleged involvement in the 2015 Stock Incentive Plan, I did not perform any of the alleged acts in Nevada." (*Id.* ¶ 11).

Furlong's declarations are similar to the others. The only difference is he does not declare he does not conduct any business for Massive in Nevada or communicate with anyone in the state in a professional capacity. Still, he declares he did not perform any of the alleged acts in Nevada. As described above, nothing in the pleadings or declarations gives the Court reason to believe Furlong has had any contact with Nevada related to Southport's allegations. The Court has no personal jurisdiction over Defendant Antaine Furlong and, for the same reasons described above, denies Southport's request for jurisdictional discovery.

e.      **Ron Downey**

Defendant Ron Downey makes the following declarations pertaining to personal

jurisdiction:

- "I reside in the United Kingdom and have since May 8, 2013." (Decl. of R. Downey ¶ 1);

- "I conduct almost all of my business in Massive's offices located in London, Sydney, and Prague. I do not have an office in Nevada, nor does Massive." (*Id.* ¶ 6);

- "Each year for the past three years I attended a three-day trade show in Las Vegas, Nevada known as the Consumer Electronic Show ("CES"). I attended CES as a visitor and not an exhibitor. Attendance at CES each of these years is my only connection to Nevada." (*Id.* ¶ 7);

- "CES organizers estimated that 170,000 people attended the 2015 show . . . . The overwhelming majority of these attendees come from outside Nevada." (*Id.* ¶ 8);

- "CES is my only professional contact with Nevada as I do not otherwise conduct any business for Massive in Nevada, nor do I communicate with anyone in the state in a professional capacity on Massive's behalf or anyone else's behalf." (*Id.* ¶ 9);

- "I do not own any personal or real property in Nevada, nor do I have any other personal assets in the State" (*Id.* ¶ 10);

Downey's declarations are similar to the others, although he does not specifically state he did not

perform any of the alleged acts in Nevada. The Court still finds no reason to believe Downey has

had any contact with Nevada in connection with Southport's allegations. He has declared that he

attends the trade show only as a visitor, and that he does not communicate with anyone in

Nevada in a professional capacity on Massive's behalf. Given the allegations and Downey's

declarations, the Court finds it highly implausible that any connection exists between Downey's

attendance at the trade show and Southport's allegations. The Court has no personal jurisdiction

over Defendant Ron Downey and, for the same reasons described above, denies Southport's

request for jurisdictional discovery.

In summary, nothing in the pleadings or declarations leads the Court to believe any of the

individual Defendants has a professional connection to Nevada, other than the attendance of

Drosin, Ramsay, and Downey at the annual CES trade show. In addition, Defendants' state that "Massive's only connection to Nevada was exclusively caused by Southport Lane Equity reverse merging Massive Media into Xtreme and then renaming the entity. Even before this merger, Massive Media never conducted any business operations in Nevada." (Decl. of A. Drosin ¶ 12; Decl. of M. Ellis ¶ 10; Decl. of M. Ramsay ¶ 12; Decl. of A. Furlong ¶ 9; Decl. of R. Downey ¶ 12). Thus, nothing suggests that Massive, or its officers and directors, conduct any business in Nevada, other than attendance at the trade show. Given the allegations and Defendants' declarations, the Court finds it highly implausible that any connection exists between Defendants' attendance at the trade show and Southport's allegations. The Court holds that it has no personal jurisdiction over Defendants Alex Drosin, Monique Ellis, Max Ramsay, Antaine Furlong, or Ron Downey.[5] While discovery could potentially uncover jurisdictionally relevant facts regarding Defendants' possible contacts with Nevada, Southport's request for jurisdictional discovery is based on "little more than a hunch," and, thus, the Court denies the request. The Court dismisses the case as to Defendants Alex Drosin, Monique Ellis, Max Ramsay, Antaine Furlong, or Ron Downey, with leave to amend as pertaining to personal jurisdiction.

### C.    Other Defenses

The individual Defendants have raised various other defenses in their motions to dismiss Plaintiff's claims. Because the Court has no personal jurisdiction over the individual Defendants, their other defenses are moot, and, thus, the Court need not address them.

///

///

---

[5] The parties also dispute whether Drosin and M. Ellis are officers and directors of Massive or merely employees. Argument on this issue is moot because Southport has provided insufficient allegations to show the Court has personal jurisdiction over them in either capacity.

### III.      MASSIVE'S MOTION TO DISMISS

Massive has filed a separate Motion to Dismiss (ECF No. 28) which includes several arguments for dismissal. Because the Court has no personal jurisdiction over the individual Defendants, it has no jurisdiction to rule on the merits involved with Massive's motion to dismiss. Massive is merely a nominal defendant. Southport seeks to hold accountable the individual defendants to protect the corporation and its interests as a shareholder. Moving forward with Massive as the sole defendant could prevent Southport from obtaining a remedy, or it could serve only to harm the corporation and the interests the shareholders seek to protect. The Court denies the motion as moot.

**CONCLUSION**

IT IS HEREBY ORDERED that the Motions to Dismiss (ECF Nos. 19, 29, 30, 31) are GRANTED, with leave to amend in part.

IT IS FURTHER ORDERED that the Motion to Dismiss (ECF No. 28) is DENIED as moot.

IT IS SO ORDERED.

DATED: March 30, 2016.

_____
ROBERT C. JONES
United States District Judge